UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                       Case No. 1:18-CR-66

AMARION AQUAI-LATROY                 HON. GORDON J. QUIST
McELRATH,

    Defendant.
_____/

**FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS**

**Findings of Fact**

On February 1, 2018, officers of the Kalamazoo Valley Enforcement Team (KVET) sought and received a search warrant for a house located at 637 Florence in Kalamazoo, Michigan. Approximately an hour before executing the warrant, KVET officers had supervised a "controlled buy" of illegal narcotics from Defendant Amarion McElrath on the 637 Florence property; KVET officers had also supervised another controlled buy on the 637 Florence property approximately a day before from an undescribed individual.

While other KVET officers sought the warrant from a state court judicial officer, KVET officers planned the raid and held a pre-raid briefing. At the briefing, officers were informed that McElrath would likely be on site and that there was an existing warrant for his arrest. The search warrant, itself, did not mention McElrath and authorized a search of "[t]he premises commonly referred to as 637 Florence Street . . . [and] any grounds, rooms, closets, **persons**, cell phones,

vehicles, storage spaces and/or appurtenant structures in control of 637 Florence Street." (Emphasis added.)

KVET officers executed the warrant on 637 Florence around 9:30 p.m. on February 1, 2018. KVET arrived at the residence from the west with a tactical minivan, militarized SWAT vehicle, and regular police cars, and from the southeast a second tactical minivan to cover the east and back doors of the residence. In total, KVET arrived with approximately 19 heavily armed and armored officers and a K-9. Sergeant Schemenauer was driving the minivan coming from the west. Driving up to 637 Florence, Schemenauer reported over the radio that there was a vehicle backed into the driveway neighboring 637 Florence and two males either walking east toward the vehicle or speaking to the driver. When KVET stopped in front of the driveway and 637 Florence, the vehicle in the driveway—a red Dodge Magnum—fled the scene and Schemenauer focused on the vehicle as it rammed his van in the getaway.

Meanwhile, the two males continued to walk east—away from the KVET officers—past the neighboring house, 635 Florence, and into a vacant lot east of 635 Florence. Officer Boutell, who was carrying a drawn firearm, followed the two men and repeatedly gave the verbal commands, "Stop! Police!" and "Get down on the ground!" One of the males, Smith, in Boutell's words, "obeyed [his] commands" and lay down in the snow. The other, later discovered to be McElrath, continued east a few more steps before also lying down. The two men were walking and not running or jogging, and Boutell considered the two men to be "in compliance" with his orders to stop. At that time, Boutell did not recognize McElrath as a person who was sought on any warrant.

Based upon the testimony of Officers Boutell and Cake, the Court finds as a matter of fact that Boutell did not stop McElrath in order to preserve the premises of the search or evidence found

2

during the lawful search, or to protect anyone. Boutell was very clear in saying that the usual reason for detaining someone during a search was that "they're possibly involved in a crime—crime is afoot." And, "Oftentime, officers may detain somebody without arresting them that—they may be involved in a crime." And, when asked, "So it's to help you solve a crime rather than to preserve the premises. Is that correct?" Boutell answered: "For this, yes, detaining that individual. I did, sir. Well, I ultimately did not detain him. That would be Investigator Cake."

Officer Cake arrived on the scene in the second minivan, southeast of 637 Florence on Woodbury, the neighboring road, and at the southern end of the vacant lot into which the males had walked. Cake saw Boutell standing over one of the males, so Cake went north along 635 Florence to assist Boutell. Officer Khillah saw one of the males, McElrath, throw two objects in the vacant lot and alerted some of his fellow officers. Boutell and Cake did not hear Khillah and were unaware, until later, that McElrath had thrown the objects. Khillah—apparently some time after the conclusion of the search of 637 Florence—found the thrown objects: a liquor bottle and a 9mm Sig Sauer handgun.

When Cake arrived to assist Boutell, the two males were complying and lying face down on the snowy ground. Boutell was with the first male, and Cake approached the second—McElrath. Cake handcuffed McElrath behind his back and then asked McElrath for his name. McElrath properly identified himself. It did not click with Cake that McElrath was the individual mentioned in the pre-raid briefing. Cake detained McElrath purely because he trusted his fellow officers—Cake did not see the men before they lay down, and Cake believed Boutell would not have detained the two males unless they had fled the scene of 637 Florence. Cake asked McElrath if he had anything illegal on him. McElrath answered affirmatively, but he did not identify the illegal item(s). In response to Cake, McElrath denied having a gun. Cake repeatedly asked

McElrath for permission to search him. McElrath repeatedly declined, saying "not if I'm not under arrest." Cake told McElrath that he was being "detained" as part of a search warrant. Cake brought McElrath back to his feet and, with McElrath still in handcuffs, brought McElrath closer to 637 Florence and the KVET vehicles. Cake told McElrath that the search warrant allowed KVET to search people associated with 637 Florence, and only then did McElrath give permission for a search of his person. Cake found a piece of foil, which police associated with narcotics, and a gun magazine on McElrath. Sometime after searching McElrath, Cake learned from other officers that McElrath was the individual identified in the pre-raid briefing. Khillah also found the gun in the vacant lot and matched it with the magazine found on McElrath. Police arrested McElrath and brought him back to the Kalamazoo Department of Public Safety, where they found 3–4 grams of crack cocaine on McElrath. McElrath made incriminating statements. Inside the 637 Florence residence, the 19 KVET officers did not find any drugs—only a woman and children and their personal effects.

## Conclusions of Law

The burden is on McElrath to first show that the search and seizure were warrantless—in this case, outside the bounds of the search warrant for the 637 Florence residence—and if he does so, McElrath will have made a prima facie showing of illegality. The burden then shifts to the government to show by a preponderance of the evidence that the search and seizure were reasonable. *United States v. Square*, 790 F. Supp. 2d 626, 643 (N.D. Ohio 2011) (collecting cases).

1) **Boutell's Stopping McElrath and Smith Constituted a "Seizure" under the Fourth Amendment and was Not a Lawful Detention In Support of the Search.**

Occupants of a building at the time a search warrant is executed may be "detained" to protect police officers, to protect evidence, and to prevent flight—without probable cause necessary for arrest or particular suspicion that the individual is involved in criminal activity.

4

*Michigan v. Summers*, 452 U.S. 692, 702–03, 101 S. Ct. 2587, 2594 (1981). Because the *Summers* rule expands police authority to detain beyond traditional Fourth Amendment limitations, "[a] spatial constraint defined by the *immediate vicinity* of the premises to be searched is therefore required for detentions incident to the execution of a search warrant." *Bailey v. United States*, 568 U.S. 186, 201, 133 S. Ct. 1031, 1042 (2013) (emphasis added).

> [C]ourts can consider a number of factors to determine whether an occupant was detained within the immediate vicinity of the premises to be searched, including the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, the ease of reentry from the occupant's location, and other relevant factors.

*Id.* Justice Scalia, in his *Bailey* concurrence, decried the "smorgasbord of law enforcement interests" that the court of appeals in *Bailey* cited in light of *Summers*:

> The *Summers* exception is appropriately predicated *only* on law enforcement's interest in carrying out the search unimpeded by violence or other disruptions. The common denominator of the few Fourth Amendment doctrines permitting seizures based on less than probable cause is the presence of some governmental interest independent of the ordinary interest in investigating crime and apprehending suspects. Preventing flight is not a special governmental interest—it is indistinguishable from the ordinary interest in apprehending suspects.

*Id.*, 568 U.S. at 205–06, 133 S. Ct. at 1044–45 (Scalia, J., concurring) (emphasis in original) (internal quotation marks and citation omitted).

At the time he was stopped, McElrath was not in the immediate vicinity of the 637 Florence residence. When the 19 police officers arrived, McElrath was on the driveway of 635 Florence and continued to walk away on the 635 Florence property and the vacant lot. Accordingly, *Summers* does not apply, and McElrath does not fall within the ambit of the search warrant. At the time Boutell and Cake detained McElrath, they lacked probable cause to seize and detain McElrath: neither Cake nor Boutell was aware McElrath threw an object; neither had seen McElrath do anything illegal; neither was aware that the walking person was McElrath. In addition, when Cake did learn that he had McElrath, Cake did not know there was an arrest warrant

5

for McElrath. As stated by Justice Scalia, preventing flight is not a special governmental interest. The question is what Cake and Boutell knew at the time of the stop; Khillah's discovery of the gun occurred later, and those circumstances were unknown to Cake and Boutell.

**2) Boutell's and Cake's Stop and Search of Smith and McElrath was a seizure prohibited by the Fourth Amendment.**

"An individual is seized when an officer 'by means of physical force or show of authority, has in some way restrained [his] liberty.'" *United States v. Beauchamp*, 659 F.3d 560, 566 (6th Cir. 2011) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 1879 n.16 (1968)) (alteration in original). A seizure occurs where, considering all of the circumstances, "a reasonable person would have believed that he was not free to leave." *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980).

McElrath was subject to a seizure due to the show of authority by both Boutell and Cake. Boutell, with his gun drawn, ordered McElrath to stop and to get on the ground. McElrath had been walking away, and "stopping after being ordered to stop triggers the Fourth Amendment." *Id.* at 567–68 (internal quotation marks, citation, and alteration omitted). McElrath submitted to Boutell's authority and got down on the ground. Therefore, the stop was not consensual. The Court must "next consider whether it was a constitutional investigatory (or *Terry*) stop." *Id.* at 569.

*Terry* involves a two-part analysis. First, "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion." *Id.* (internal quotation marks and citation omitted). Second, if the first part is met, "whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the

6

reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Id.* (internal quotation marks and citation omitted).

### a) There was not a proper basis for the stop.

Officers must have a "reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity;" the suspicion "must be based on specific, objective facts" in light of the totality of the circumstances. *Id.* at 569–70 (internal quotation marks and citations omitted). "[T]he high-crime or high drug activity [area] label must be applied carefully . . . [because] it can easily serve as a proxy for race or ethnicity." *Id.* at 570 (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) (en banc)). "Simply talking to someone else, without more, is innocent activity and does not indicate that a crime is happening or is about to take place." *Id.* "[H]urriedly walking away from an officer without making eye contact . . . does not rise to the level of independent suspicion." *Id.*; *but see United States v. Jones*, 673 F.3d 497, 502 (6th Cir. 2012) (noting that presence in a high crime area and "unprovoked flight upon noticing the police," *i.e.*, running away "like a sprinter," were sufficient to establish reasonable suspicion).

The totality of the circumstances here does not support a reasonable suspicion. The area of the raid was known to officers as a high-crime area, but that alone is insufficient. McElrath and the other male were walking east, away from the residence. They were walking toward the Dodge Magnum that fled the scene, but Schemenauer was not sure whether they stopped to speak to the vehicle or were simply walking towards and around it. McElrath did not run away, complied with Boutell's orders, and was entirely "cordial" and cooperative to Cake. McElrath's "exercise of his right to walk away" did not render him a "suspicious suspect." *Id.* at 571. Neither Boutell nor Cake was aware at the time that Khillah saw McElrath throw objects into the vacant lot. Neither

recognized the individual as McElrath. After handcuffing McElrath and learning his name, it did not click for Cake that there was a warrant for his arrest. Accordingly, officers lacked reasonable suspicion and the stop was an illegal seizure in violation of McElrath's Fourth Amendment rights.

**b) Officers exceeded the bounds of a *Terry* stop.**

Even if the police satisfied the first prong of *Terry*, they exceeded the bounds of the second prong. Under the second prong, the detention must be reasonable: limited in time and using the least intrusive means reasonably available. *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005). A permissible stop becomes an impermissible seizure if "it occurs over an unreasonable period of time or under unreasonable circumstances." *Id.* (internal quotation marks and citations omitted). The stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.* A pat-down is permitted where an officer "has reason to believe that he is dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883. "[F]or the use of handcuffs during a *Terry* stop, the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case." *Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005).

The officers exceeded the bounds of *Terry*. There were no articulable facts to support handcuffing McElrath under *Bennett*—McElrath complied with Boutell's orders and was cordial and cooperative with Cake. There was no indication that McElrath posed a risk or safety hazard to the officers. "[T]he use of handcuffs during this *Terry* stop violated [McElrath's] Fourth Amendment rights." *Id.* at 837 (holding handcuffing was unreasonable where there were no facts indicating attempts to flee, possession of weapons, or that individuals would "do anything else that

would warrant this use of force," *i.e.*, handcuffs). Any conversation after the handcuffing was therefore tainted.

### 3) McElrath's consent to be searched was not voluntary.

"[A] search of a person is not unreasonable if that person gives free and voluntary consent." *Beauchamp*, 659 F.3d at 571. The burden is on the government to prove consent was voluntarily given. Courts consider the totality of the circumstances, including whether police informed the individual that he could refuse, the details of the detention, coercive conduct, and "more subtle forms of coercion." *Id.* (collecting cases). Even if consent is voluntary, "the evidence must be suppressed [when] it is tainted by the illegality of the initial stop." *Id.* at 573.

McElrath did not give voluntary consent to be searched. Cake repeatedly asked McElrath for permission to search him and McElrath repeatedly declined. With McElrath's movement restricted, and with handcuffs on him, Cake coerced McElrath into consenting to a search by implying that he had the right to do so via the search warrant. Further, the illegality of the initial *Terry* stop tainted any subsequent consent that McElrath may have given.

### 4) Inevitable Discovery Doctrine.

"The inevitable discovery doctrine, an exception to the exclusionary rule, allows unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995).

The government did not satisfy this burden. As discussed, officers lacked probable cause to detain McElrath. Officers exceeded the bounds of *Terry*. Khillah's subsequent discovery of the gun and Cake's subsequent realization that there was an arrest warrant for McElrath, do not cure earlier violations of McElrath's Fourth Amendment rights. "The Supreme Court has held that

probable cause determinations must be evaluated according to the information the police knew at the moment of the challenged conduct, not information learned for the first time afterwards." *Peet v. City of Detroit*, 502 F.3d 557, 565 (6th Cir. 2007) (citing *Beck v. State of Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225 (1964)).  The fact that McElrath was subsequently booked on the preexisting arrest warrant does not justify the earlier violations or show that the evidence would have inevitably been discovered if not for the violations.

## Order

Therefore,

**IT IS HEREBY ORDERED** that Defendant's Motion to Suppress Evidence (ECF No. 24) is **GRANTED**.

The physical evidence found on McElrath at the scene after the seizure and the evidence found and statements made at the Kalamazoo Public Safety Department **are suppressed**.

What the officers observed prior to the seizure, including evidence that a person later identified as McElrath threw something into the vacant lot and the discovery of the firearm in the vacant lot, **are not suppressed**.


Dated: August 31, 2018                                       /s/ Gordon J. Quist
                                                                              GORDON J. QUIST
                                                                    UNITED STATES DISTRICT JUDGE